STATE OF MAINE
AROOSTOOK, ss

SUPERIOR COURT
DOCKET NO. CR-18-20695

MATTHEW DAVIS
                    Petitioner

)
)
)
)
)
)
v.                                                      )          DECISION
)
)
)
)
)
STATE OF MAINE                                           )
                    Respondent                          )

Pending before the court is the Petitioner's Petition for Post-Conviction Review of his

2017 convictions for two counts of murder, four counts of arson, three counts of theft, and one

count of aggravated criminal mischief as alleged in the Aroostook County Grand Jury's

indictment of November 8, 2013. The Petitioner pursued his rights of appeal before the Maine

State Supreme Court and his convictions were affirmed on August 14, 2018. (See State v. Davis,

2018 ME 116, 191 A.3d 1147.) On November 18, 2018, the Petitioner filed a pro se Petition for

Post-Conviction Review; counsel was appointed, and an amended petition was filed on

December 7, 2021.

A central issue at the Petitioner's trial was the reliability of the "eyewitness

identification" testimony presented at trial by the State's principal witness William Lloyd. The

Petitioner contends that his lead trial counsel was ineffective because he failed to follow through

with his plan to call an expert witness to provide the jury with evidence establishing the potential

unreliability of "eyewitness identification" testimony. For the reasons set forth herein, the court

denies this petition.

1

# BACKGROUND

The relevant facts pertaining to the Petitioner's contention can be taken from the court's August 18, 2016 Order denying the Petitioner's Motion in Limine. Those facts are as follows[1]:

> William and Shannon Lloyd were living next door to the decedents in Oakfield. They had been living there for at least the previous 6 years and were friends with the decedents. At approximately 4 am on September 23, 2013, the Lloyds were awakened by the sound of multiple gunshots coming from the general direction of the decedent's home. William Lloyd got out of bed and went into his bathroom that had a window facing the decedents' home. He began to hear the sound of fire alarms and he could see a "glow" at the decedents' home. He quickly got dressed and went outside and up a few steps leading to the main door of the decedents' home. This door was also directly across a driveway from the Lloyd home. The door was locked but he could see fire inside the home. He also saw a figure inside the home; there was movement but he couldn't identify anything else about it.

> Mr. Lloyd went back down the stairs and moved towards the decedents' garage that was just a few feet away. Suddenly a vehicle backed out through the garage door nearest the decedents' home. The garage door was down at the time. Mr. Lloyd immediately recognized the vehicle as Mr. Kitchen's father's pickup truck. An exterior yard light was located at the center peak of the garage. It was on and illuminated the entire area including part of the interior of the pickup truck. Mr. Lloyd had heard gun shots and he wanted to know who the driver of the vehicle was so when the vehicle emerged from the garage, Mr. Lloyd moved over in front of the vehicle and looked through the front windshield to determine if the driver was either Ms. Pratt or Mr. Kitchen. Mr. Lloyd is 6 feet tall and was standing stationary just three feet away from the front of the vehicle when he "locked eyes" with the driver for approximately 4 seconds.

> Mr. Lloyd was unsure and it remains unclear to the court whether the vehicle's head lights were on or not. Assuming that they were on and generally directed towards Mr. Lloyd, the evidence indicates to the court that Mr. Lloyd was sufficiently close to the vehicle such that the head light beams would have illuminated his lower body and midsection but probably not his head and shoulders. He was able to determine that the driver of the pickup was neither Ms. Pratt nor Mr. Kitchen but rather a white male with a light complexion and a "buzzed off" hair cut. The man had really big eyes. The man was wearing a tee shirt. The man was not wearing a hat; he did not have glasses and he had no facial hair. Mr. Lloyd did not know the man's name.

> The photo depicting the garage indicates that the driveway was "horseshoe" shaped. The driver of the vehicle then moved along the driveway in the general direction of the Lloyd home before completing its turn and exiting the driveway onto the adjoining street.

---

[1] The court has omitted the single footnote that appeared in its earlier Order and several references to exhibits.

As the vehicle was moving around the driveway in the direction of the Lloyd home, both Mr. and Mrs. Lloyd began to run towards their home. Mrs. Lloyd ran into the home and called 911 to report what they had seen. Both Lloyds experienced some level of emotional distress from their involvement in the underlying events and were undoubtedly both fearful as those events unfolded.

Later the next day, and before Mr. Lloyd had met with any law enforcement officers, he got a text message on his phone from an acquaintance. The message informed him that there was a story about the recent events on the BDN Facebook page. Mr. Lloyd went to that Facebook page and there observed the booking photo of the Defendant that BDN had obtained and then posted on its Facebook page. The name "Matthew Davis" was associated with the picture. He recognized the photo as being the same man that he had seen in the pickup truck and had subsequently described for law enforcement officers.

Later that same day, Maine State Police Detective Greg Mitchell came to meet with Mr. Lloyd pursuant to arrangements he had earlier made. Det. Mitchell indicated to Mr. Lloyd that he was there for the purpose of showing him a photo lineup of several individuals. Before Det. Mitchell could show Mr. Lloyd the photo array, Mr. Lloyd reported that he had already seen a photograph of the Defendant, Matthew Davis on Facebook. Following this disclosure, Det. Mitchell called his supervisor, Lt. Troy Gardner who advised him not to proceed with showing Mr. Lloyd the photo lineup, but rather simply proceed to take a statement from Mr. Lloyd and Det. Mitchell did so.

Mr. Lloyd indicated to Det. Mitchell, as he later testified at the hearing, that he was 100% certain that the man that he observed through the pickup truck windshield was the same man whose photo he had seen on the BDN Facebook page.

Mr. Lloyd had previously been acquainted with Mr. Davis as the result of the Defendant's patronage of the grocery store where Mr. Lloyd worked and as the result of his having participated in a motorcycle education course with him several years earlier. Mr. Lloyd indicated that the Matthew Davis with whom he had been acquainted had longer hair and had facial hair as depicted in State's Exhibit 3 MIL. Notwithstanding his prior interactions with the Defendant, Mr. Lloyd did not recognize the man that he saw through the pickup truck window to be Matthew Davis.

The evidence also indicated that Shannon Lloyd saw the person driving the pickup truck but was not able to identify that person, even by subsequently viewing photographs. She testified that the person looked similar to the person whose photograph appeared on the BDN Facebook page. She probably told law enforcement that she thought the driver was wearing a maroon sweatshirt. This would appear to be at odds with Mr. Lloyd's description of the driver wearing a light colored top.

Det. Greg Mitchell testified that he was certain that he did not show Mr. Lloyd any photograph as per his instructions from Lt. Gardner after learning that Mr. Lloyd had

seen a Facebook photo of the Defendant. Mr. Lloyd testified that he thought Det. Mitchell did show him a photo but he was not sure if he looked at it and simply told Det. Mitchell that he had already seen a photo. The court finds Det. Mitchell to be the more reliable historian on this point.

The court conducted an evidentiary hearing on the petition on September 7, 2022. At that hearing, the court received testimony from the defense assisting attorney, the Petitioner's spouse, and Dr. Brian Cutler. Dr. Cutler was the expert witness that Petitioner's lead counsel failed to call as an expert witness at trial. Following the hearing, the court invited written arguments from counsel, the last of which were received on May 24, 2023. The matter was then submitted to the court for decision.

## STANDARD OF REVIEW

To prevail in a post-conviction proceeding based on an alleged constitutional deprivation of the effective assistance of counsel, the petitioner has the burden of proof and must demonstrate two points; first, "that counsel's representation fell below an objective standard of reasonableness," and second, that "errors of counsel actually had an adverse effect on the defense." There is thus both a "performance" prong and a "prejudice" prong to the inquiry. The court may consider either prong first; if the petitioner fails to demonstrate "prejudice", it is unnecessary for the court to address the issue of whether trial counsel's performance was deficient. Francis v. State, 2007 ME 148, ¶ 6, 938 A.2d 10. These elements of an ineffective assistance case, when proved, constitute a "showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Theriault v. State of Maine, 2015 ME 137, ¶14

Thus, to prove that one has been deprived of their constitutional right to the effective assistance of counsel, a petitioner must prove both a "performance" prong and a "prejudice"

4

prong by a preponderance of the evidence. A failure of proof on either will lead to a denial of the petition.

In Roberts v. State of Maine, 2014 ME 125, ¶23, 103 A.3d 1031, 1039, the Law Court indicated that to prove that counsel's performance was constitutionally deficient,

> "a defendant must show that counsel's representation fell below an objective standard of reasonableness. The question is whether the counsel's performance fell within the wide range of reasonable professional assistance that a competent criminal defense counsel could provide under prevailing professional norms. The *Strickland* test compels us to reconstruct the circumstances of counsel's challenged conduct and to evaluate the conduct from counsel's perspective at the time." (Internal citations and punctuation omitted.)

In *Theriault,* the Law Court discussed the prejudice prong and recognized that there can be cases, albeit rare ones, where counsel's performance has been so deficient that it amounts to a constructive denial of the assistance of counsel and in such extreme cases of ineffectiveness, the petitioner is relieved of the burden of affirmatively proving prejudice because in such cases a complete failure of representation can be legally presumed to have occurred.

Accordingly, with regard to the issue of "prejudice", except in those rare instances of extreme ineffectiveness, the petitioner must prove that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. The Law Court was careful to point out that its reference to "probability" should not restrict a court's analysis to a *quantitative* inquiry and that it should also extend to a *qualitative* inquiry, that is one that involved an analysis of whether counsel's performance was such that it undermined confidence in the outcome of the proceeding and rendered that outcome unreliable. *Id* at ¶19.

Thus, "prejudice" can be established where it can be demonstrated that counsel's errors more likely than not actually altered the outcome of the case and "prejudice" can also be

5

established where, although one may not be able to say that it changed the likely outcome of the case, questions of fundamental fairness remain and must be considered. This means that "prejudice" can be established by showing that counsel's performance was such that it undermines confidence in the reliability of the outcome.

Maine's jurisprudence pertaining to the question of "ineffective assistance of counsel" draws extensively from Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674.

Among the relevant principles that Justice O'Connor set forth in her opinion in *Strickland* were the following:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstance, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client the same way. *Id* at 689.

## DISCUSSION

A major part of the defense strategy at the Petitioner's trial was to challenge the reliability of William Lloyd's identification of the Petitioner as the person fleeing the decedents' residence in Oakfield, Maine. Recognizing that the reliability of "eyewitness identification" was an emerging area of the criminal law and that expert witnesses were sometimes employed to assist in challenging such identifications, on July 22, 2016, the court issued an order requiring the defense to identify any intended expert witnesses by August 5, 2016. Although the Petitioner's

lead counsel had discussed employing an "eyewitness identification" expert with the Petitioner and family members; although the Petitioner's family was able to provide sufficient funds to engage an expert when funds were requested[2]; although he did ultimately engage an expert and receive a report dated November 29, 2016 [3] setting forth the expert's opinion, he did not disclose the existence of the expert to the State until just before the start of the trial and did not provide the State with a copy of that expert's report until December 9, 2016, the third day of his jury trial. The defense had previously indicated that it did not intend to call any experts. After hearing arguments from counsel, the court denied the untimely defense request to call Dr. Brian Cutler as an expert witness regarding the reliability of "eyewitness identifications."[4]

The Petitioner now contends that his lead trial counsel's failure to employ and to disclose Dr. Cutler as an expert witness in timely fashion amounted to ineffective assistance of counsel[5].

Dr. Cutler testified by zoom at the hearing on the petition on September 7, 2022.[6] The essence of his testimony was that the accuracy of an eye witness' testimony can be adversely affected by several different factors. These include how long a witness has to make his observations, i.e. how long was the exposure opportunity for seeing a person's face? They also include consideration of the prevailing lighting conditions and whether they were favorable or unfavorable to seeing what was there to be seen. Dr. Cutler testified that there could be other factors associated with the witness' opportunity to see, "encode" (i.e. form a reliable memory)

---

[2] The lead counsel was privately retained in this case.

[3] Dr. Cutler's invoice (Petitioner's Exh. 2) reflects that the date of first contact was on October 3, 2016 and that Dr. Cutler was retained on November 7, 2016.

[4] The court notes that the Petitioner challenged the court's ruling on appeal and that the Law Court found the argument unpersuasive. (See State v. Matthew Davis, 191 A.3d 1147, fn 1)

[5] The court notes that lead trial counsel passed away in March of 2017 and was therefore not available to participate in the hearing of this petition.

[6] At the Petitioner's request, the court left the record open to afford an opportunity for counsel to consider whether the Petitioner wished to challenge certain surveillance video at the Katahdin Forest Products plant. Counsel ultimately decided against pursuing any challenges associated with that "identification" and the matter was submitted to the court for decision on May 24, 2023.

7

and recount such as being in an extremely stressful environment as events unfold.[7] Dr. Cutler pointed out that each of these factors could potentially adversely affect a person's ability to form an accurate and reliable memory of what the witness purports to have seen. Dr. Cutler also addressed the possibility that a witness might be exposed to post-event information that could also influence the accuracy of the witness' identification. [8]

In describing his research regarding eyewitness identification, Dr. Cutler was careful to point out, "What I don't do is give an opinion about the—accuracy of any eyewitness identification." (See Evidentiary Hearing Transcript page 41, line 15-16) At most, what Dr. Cutler could have testified to at trial was, as he wrote in his report, "My opinion, which I hold to a reasonable degree of scientific certainty, is that certain factors associated with the conditions under which the Lloyds viewed the subject on the evening of September 23, 2013 and the nature of the eyewitness identification *may have influenced the accuracy of the description, identifications and the confidence of the eyewitnesses.*(emphasis supplied)."

As indicated above, the court may discuss the two required prongs of proof in the order of its own choosing. The court will first address the "prejudice prong."

To prevail on his petition, the Petitioner must persuade the court that he was prejudiced by his lead trial counsel's performance. This court is not persuaded that the Petitioner suffered prejudice as the result of the absence of Dr. Cutler's testimony. In this court's view, such testimony would have left the reliability of William Lloyd's identification of the Petitioner in the realm of *mere possibility* rather than probability. Dr. Cutler's testimony would not have provided

---

[7] Dr. Cutler described these as the "coding stage, the storage stage, and the retrieval stage of memory. (See Evidentiary Hearing Transcript p. 41, lines 8 to 10).

[8] Aside from Mr. Lloyd's post-event viewing of a photo in the Bangor Daily News and the suggestion that one of the detective's may have shown him a photo of the Petitioner, both matters that the court addressed in it's pre-trial Order on Motion in Limine, the court is unaware of any such exposures, such as conversations with his spouse or others pertaining to the Petitioner's role in the underlying events.

the jury with any greater cautionary instruction than that which the court provided in its own instructions. Dr. Cutler testified at hearing of this matter that he would have highlighted for the jury the need to consider several different factors in evaluating the William Lloyd's eyewitness testimony. He would have testified that jurors should consider the length of time that Mr. Lloyd had to observe the Petitioner's face; that they should consider the impoverished lighting conditions that were present; that they should consider the high level of stress present during Mr. Lloyd's observation period. According to Dr. Cutler, each of these factors, either separately or cumulatively, could have affected Mr. Lloyd's ability to perceive accurately, to formulate a memory accurately and to recount accurately what he believed he had seen. That said, Dr. Cutler could not say whether Mr. Lloyd's eyewitness testimony was accurate or inaccurate.

In it's instruction pertaining to the jury's role in evaluating witness credibility, the court instructed the jury as follows:

> You can consider how good an opportunity the witness had to make the observations that he or she says were made. As you are evaluating the evidence and perhaps considering a witness' opportunity to observe the things that the witness has described in his or her testimony you should understand that we have come to recognize that testimony by a witness as to identity must be received with caution and scrutinized with care. The State's burden of proof extends to every element of each crime charged, including the burden of proving beyond a reasonable doubt the identity of an alleged perpetrator of an offense. Accordingly, as you are considering the accuracy of any eye witness identification testimony, you may consider the opportunity that the witness had to make that identification, taking into account such things as the length of time spent in making the observation, the particular circumstances of the opportunity, including the distance between the witness and the person being identified, the lighting conditions at the time and the degree of stress the witness may have been experiencing at the time of making his or her observations. You are also free to take into account whether the witness was influenced by any suggestive events or by the recollections of other witnesses or by identifications made by other witnesses. You may wish to take into account any lapse of time between the event and the identification. You may want to consider how much weight to assign to the degree of confidence a witness may have expressed in his or her identification recognizing that even very confident people can be wrong. Ultimately, I would

9

suggest that you want to consider the totality of all of the circumstances that surround eyewitness identification testimony.

This court is not persuaded by the Petitioner's suggestion that hearing the same caveats from an expert witness would potentially carry more weight that the court's instructions. Particularly when, as in this case, the court sent copies of its written instructions into the jury room with each juror. The jury in this case heard the lead counsel's thorough cross-examination of William Lloyd; the jury heard lead counsel's closing arguments pertaining to William Lloyd's eyewitness testimony; the jury heard the court's cautionary instructions; and each juror had a written copy of the very same instructions to refer to during deliberations. In this court's view, it was highly unlikely that the jury would have failed to appreciate the court's instruction that they needed to take great care in evaluating Mr. Lloyd's testimony. Accordingly, this court concludes that the outcome of the Petitioner's trial was not altered by Dr. Cutler's absence from the proceedings.

Further, this court is not persuaded that Dr. Cutler's absence from the trial proceedings undermined confidence in the reliability of the outcome of that trial or in some way raised questions regarding the fundamental fairness of the trial proceedings. Although the testimony of William Lloyd was of the utmost importance to the State's case, that testimony was not the only evidence pointing to the Petitioner's guilt. As the State points out, there was considerable other circumstantial evidence of the Petitioner's guilt. This included evidence that a rifle that the Petitioner had purchased at a local firearm store was found on the chest of one of the murder victims. Additionally, a glove with the Petitioner's DNA on it was found near one of the bodies at the crime scene. The Petitioner's wrecker truck was found at the Katahdin Forest Products business from where a truck had been stolen and later driven into the side of the victims' home.

Boot prints matching the Petitioner's footwear connected him to the stolen vehicle. William Lloyd testified that the Petitioner drove off in a truck taken from the victims' garage at their residence. A revolver that the Petitioner had purchased from the Kittery Trading post was found within that truck as was a soda bottle bearing his DNA. This evidence, albeit circumstantial, tied the Petitioner to the crimes for which he was convicted. The court concludes that the Petitioner suffered neither quantitative nor qualitative prejudice from Dr. Cutler's absence at trial.

Having reached this conclusion, it is unnecessary for the court to consider whether lead counsel's performance fell below an objective standard of reasonableness. The Petitioner argues that there could be no strategic reason for the lead counsel to have declined to arrange for Dr. Cutler's testimony at trial. Unfortunately, lead counsel is now deceased and is not available to explain his rationale for proceeding as he did. One might speculate however, that lead counsel recognized that Dr. Cutler's testimony could be effectively challenged on cross-examination and that ultimately Dr. Cutler would have to concede that there was no way for him or anyone to know whether William Lloyd's identification of the Petitioner was reliable or not. If Dr. Cutler's testimony was unable to advance the ball towards the goal, why put him on the witness stand and expose him to cross-examination that might serve only to establish that he didn't really know whether Mr. Lloyd's identification was reliable or not? A weak and easily assailable witness presented as an expert could easily produce the unintended consequence of undermining the strength of other aspects of the Petitioner's defense.

The court has also speculated, without reaching any conclusion, that lead counsel was attempting to create an issue for appeal. Although this court ruled that the Petitioner could not call Dr. Cutler to testify at trial. Eyewitness identification is an emerging issue in the criminal law and it's possible that the Law Court might have found the issue to be of sufficient import to

11

have justified allowing the Petitioner to call him to testify thereby concluding that this trial court erred in ruling as it did.

With these speculations in mind, and with Justice O'Connor's cautionary remarks in mind as well, it cannot be said that lead counsel's decisions were completely devoid of any strategic merit.

## CONCLUSION

The court concludes that the Petitioner has failed to carry his burden of demonstrating that he suffered prejudice, either quantitative or qualitative, as the result of his lead trial counsel's failure to timely engage Dr. Brian Cutler as an expert witness at the Petitioner's trial.

The entry shall be: The Petitioner's Petition for Post-conviction Review is denied.

October 16, 2023

E. Allen Hunter
Justice, Superior Court (Active Retired)

12